The next case is for, excuse me, Oral Argument is asking AFL-CIO, Council 31 et al. v. Rauner et al. The case number is 517-0095. To distinguish the two cases. Council, whenever you're ready, you may proceed. Thank you, Your Honor. May it please the Court. This case is the second part of what you just heard. This is the separate piece about a fundamental separation of powers question. When you are faced with two valid sources of funding authority, which constitutional entity gets to decide which of those two sources of funding authority to use. Under the Illinois Constitution, you have to choose between the governor as chief executive of the state and the various administrative agencies that he represents and the comptroller. And the reality of that is that when you look at the State Finance Act, and you look at the process that the legislature has set out for the payment of bills by the state of Illinois, there's a very straightforward process that is followed. The way that that process works is you go first to the State Finance Act, specifically 30 ILCS 105-9.02 and 9.03, and those lay out that it is the responsibility of the agency requesting payment to complete and submit a voucher. As part of that process, the voucher must indicate the source upon which those funds are drawn. And when you look at specifically section 105-9.03, there's a specific certification that each agency under the control of the governor's chief executive must make. That certification indicates the, among other things, the source of funding upon which payment is requested. Once that certification is made, and by the way, that certification is critically important because if you look at section 105-9.06, the person making that certification at that agency actually loses his or her position or his or her job if that certification is false. So they bear the responsibility for properly certifying the source of payment made. Only at that point does the appropriation then transfer over to the comptroller's office, where the comptroller follows through a specifically delineated process in 50 ILCS 405-9, and processes to ensure that, in fact, those payments were validly made upon the sources that the agency has already certified. That process is very straightforward. The agency by statute is supposed to look, determine whether the source of funding is valid, and determine whether it is properly certified, and walk through the other checkpoints in the statute. If those checkpoints are met, the comptroller's job is done. She then forwards on a warrant to the state treasurer, who actually cuts the check to get the money's pay. The problem with this case is that if you take as a predicate the presence of two equally valid sources of funding authority, either, in this case, the July 10, 2015 St. Clair order, or a separate appropriated funds from the legislature, the comptroller, what she did in this case was say, I am going to refuse to cut a voucher, not because I say that the July 10, 2015 St. Clair County employee pay order was invalid, because she cannot take that position, and she has not taken that position, which is why, in the prior case, the attorney general was standing up here, and the comptroller has assiduously avoided joining that position of the attorney general. The reason she can't do that is because she has, in fact, processed vouchers for the payment of the specific 578 employees of the central management services that are at issue in this aspect of this appeal, and has done so pursuant to the St. Clair County July 10, 2015 order. Once she's done that, she's conceded that she believes that that order is a valid source of funding authority, and there is nothing else for her to do when she receives a voucher drawn on that authority, but to go ahead and pay that, and pay that voucher. So you disagree with CMS's argument that there's an additional discretionary duty that she has to determine where the money comes from, essentially? I think you're on a meeting with the comptroller, sorry. The comptroller. Yeah, just wanted to make sure I was understanding. Okay, that is correct, Your Honor, and the reason that there is no need for that additional exercise of discretion is that it's simply not in the statute. Her duty is to determine whether the voucher is drawn on a valid source of authority, and if you look at, and that is laid out clearly in section 459 subsection C, the notion, and that is really where you get into the fundamental separation of powers problem, because what the comptroller is claiming that she has the authority to do is look at two sources of funding authority that the agency, under the jurisdiction of my client, the Governor of Illinois, has determined should be paid, and move from there to saying, I recognize that that is a valid source of funding authority. I nevertheless refuse to draw on that source of funding authority because I would prefer it be paid some other way. Frankly, that is an assertion of remarkable breadth, because what that says is that the comptroller can direct the agencies and ultimately direct the Governor how to manage their budgets, and that position puts the comptroller in the position of dictating to the Chief Executive of the State of Illinois how he runs his agencies. So that is the fundamental separation of powers concern that is problematic in this case. So if the injunction were to be dissolved, is this case moot? Your Honor, it is mostly moot with one exception. What you should do is you should then vacate the order below of the court in this appeal, in the 095 appeal. But yes, if this is a pendant case to the separate 061 appeal regarding the validity of the July 10, 2015 order. But she is paid pursuant to the order. That's correct. But now she wants to pay not pursuant to the order. That's correct. So it's really not moot, then, if she continues to pay from the, quote, unappropriated funds? I don't think that... I mean, I don't know what she'll do, obviously. I may be misunderstanding your question, Your Honor, but I don't think that the comptroller would take the position that if the July 10, 2015 order were to go away, that she would continue to pay under general revenue funds that are not subject to a specific appropriation. That order has been the whole basis for her making those payments. So the trial court talked about the argument of CMS that we have essential services to be paid, which takes me back to this whole concept of, does the comptroller have the right to decide funds based on whether or not a fund is going to be depleted and, therefore, essential services would not be covered? So, Your Honor, what that distinction, that distinction is not, as I understand it, an argument that the comptroller has made here, nor can she do so, because she is continuing to pay, among other things, I think at the last count, something like $28 million of the attorney general's payments for attorney general employees over the last year. So the argument is not, from the comptroller, we will not have any more money. The argument from the comptroller is that she had established in the past an arbitrary number internally where she said, I will pay for these particular employees at CMS up to a particular dollar number, and then I will no longer make those payments. Well, on page 2 of the court's order, in paragraph 2, it says, that if it is required to pay wages from the limited cash and appropriated funds for this fiscal year, there will not be enough cash to satisfy the intended purposes of the RF to provide funds for many critical essential services. I see where you're going now. So that is, that is with regard to the specific appropriation lines that were in, that the comptroller wants to force the executive to use to make these payments. So those are not- That was precisely my point, though maybe my question was unclear. Isn't she or doesn't she, or the comptroller generally, have the right to look at the budget and say, if we pay from here, we're not going to have enough money to cover essential services? Are you requiring, are you taking away any discretion that she has? Or is that inherent in the way the laws are written? You know, Justice, I think that that's actually the flip side of the argument. That is the argument that CMS was explaining, because the funds that were appropriated there were for use of a number of purposes, including things like paying gasoline for state troopers' cars,  paying for rent on buildings that executive agencies in the state of Illinois uses. Okay, I understand all that. But you haven't answered my question, really. And that is, does she have the discretion to make those decisions because of the, quote, essential services? Or are we going to, by law, just let the executive agencies dictate, regardless of whether the funds run out? So the, I think that... Which do you choose? No, if you were in a situation where the funds were going to, that were the IWRGO funds, that would be a different situation than the situation where you are, you have the comptroller dictating which of two funds, with cash available, must be used. So we're not talking about an impossibility situation. I don't think she is either. I think, isn't that their argument, that we don't want funds for essential services to run out, and so we're going to use another fund? No, not at all, Your Honor. That is CMS's argument. CMS's argument is that the funds that were appropriated, the funds that the comptroller is forcing CMS to use for payment of employee salaries can and should, in CMS's discretion, be preserved so that we can pay for those essential services that you're referencing, the things I was mentioning, such as rent on buildings. I think we're talking about the same thing. Maybe I'm being inartful about it. I probably am. No, I'm not. But your argument is that you want to preserve, quote, essential services. How is that different from her argument, ultimately? Because... I mean, it seems like both of you want to preserve essential services and get your employees paid. Am I wrong about that? Yes, I think you are mistaken about that. Okay, explain that to me then. So the reality is that we're talking about, when you talk about essential services, you need to break that into what you mean by essential services. When you say, because there are two components of that, there's the component of paying state employees to perform those essential services, and then there's the component of paying for the goods that are necessary for them to preserve those essential services. So we're talking about the revolving funds. That's correct. Okay, and they are far, you're talking about necessary goods, they involve... That's correct. Okay. And that's why I was saying, the revolving funds that are at issue here can be used, and in fact have been used, for payment of goods and services other than state employees. But can I ask something? So, obviously, our injunction didn't name where the money was to come from at all, correct? The, if you're talking about the St. Clair order? Yes. It actually does. It draws on the state's general revenue fund. It does say it has to come from the revenue fund. Which is, if you think of it as the fund where most of the state's revenues go, where most of the state's payments come from, as opposed to, then you can also appropriate two specific funds, such as the two revolving funds at issue here. Okay, what about the temporary budget? Does it talk about where those funds will be paid from? Yes, and so what happened is, the funds that we're talking about here, and the two revolving funds, are from the temporary budget, and those funds are specifically to be used for certain purposes that are enumerated in statute. What would normally happen in a normal year with a full budget, is that there would be payments made into those funds by other agencies. In other words, those funds get separately appropriated so that you have central management services, which acts as like the, acts as the clearinghouse. So, if the state wants to buy toilet paper, only one agency has to do that. If everybody had a chart. I'm sorry, I know. It becomes a mess very quickly. But the bottom line is, normally there would be funds flowing into the revolving funds. They would enable those funds to be used to pay out for additional purposes. What was appropriated into those funds was less than what would normally be used for those, and as a result, what the governor, what central management services, sought to do was say, we are allowed to pay for goods from these revolving funds. We are allowed to pay for repair of state automobiles, for gasoline. So, they don't want to fund you stuff. That's right. By the executive discretion, when it submitted the vouchers for employee pay, said, we have two options for paying these vouchers. We can either submit these vouchers, as we've been doing, under the St. Clair July 10, 2015 order, which only covers employee pay. So, we can only tap those funds for employee pay, or we could tap the revolving funds, which we need and wish to preserve to pay for other goods and services other than employee pay. Central management services made the determination in its discretion that when it filled out its voucher form, it designated the St. Clair order. And then, what happened is the comptroller said, no, I have the authority and the power to tell you, executive, that you may not send that voucher, that that voucher is invalid, which is the only thing for statutory, that's the only thing that she's allowed to do by statute, and therefore, to require you to submit it on the revolving funds. Because it wasn't good to... Because employees can be paid from either fund. Goods and services can only be paid from the revolving funds. Has this come up before? In a normal year, it would not come up. In a normal year, you wouldn't have the St. Clair order for that matter. You would have the normal appropriations process. That's not the situation that we're in. So, no, I'm not aware of a situation where this has come up before. So, all that to say, I'm sorry, I apologize for the confusion there, but... I'm still unclear why CMS submitted vouchers, or why it objects to the, except for the issue of control, the constitutional provisions, why, as a practical matter, it objects to drawing these vouchers or getting paid from these other funds. What's the beef, so to speak? Sure. So, I think there are two answers there. The first one is, I don't think that you can dismiss the structural separation of powers concern. I've got the separation of powers issue. The second piece of it is that we're talking about a situation where there are more demands on the revolving funds than there are funds available. So, they don't want the money used up. That's correct. Don't want the money... That's the best. Don't want the money depleted, and want to be able to reserve flexibility because we're in a situation now where we have limited fiscal flexibility to pay bills, and we would prefer to have flexibility to pay things like gasoline for trooper cars rather than drawing those funds down. And then being in a situation where we could have paid those using the court order, but instead, because the comptroller refused, we paid down the funds and the revolving funds, and now we have no ability to pay for rent on a building, for instance. That's the beef, and that's where it matters as a practical matter, and that's why... And that's from the revolving fund, the RF. That's correct. And yet, you submitted your employee pay vouchers to which fund? The employee pay vouchers were submitted to the general revenue fund pursuant to the court order. That's the RF? No. Referred to in this court's order? No, that is not. Okay, that's a distinction. That is the distinction there. The court's order could be unclear, Your Honor, if I may just say. Yeah, it was unclear. That's why I'm... The court's order, if you look at... I see page 1, ma'am. Yeah, sorry. If you look at... GRF is general revenue fund. GRF is general revenue fund. And then RF is revolving fund. So it is somewhat confused. That's correct. I got it now. That's correct. Thank you. Sorry. And you can see that if you look at, on our brief 804, if you look at the first page of the order where the court defines state general revenue fund as GRF, there is not in the order itself anywhere where they define RF as revolving fund. But I think that is the import of the order, and that is certainly what that is. And if you look at the second full paragraph on page 805, it makes it clear that RF is referring to those revolving funds. Yes, thank you. Thank you, counsel. Counsel. Good morning, Your Honors. May it please the Court. Counsel. Brett Laitner on behalf of the Illinois Comptroller. Your Honors, this Court should affirm the circuit court's order denying the Governor's motion to modify or alter or enforce, you know, it's got a lot of different names, the preliminary injunction of this case. Before I turn to my head of remarks, I want to just address a couple of points that were raised towards the end of my colleague's statements. First, the original St. Clair order, so the temporary restraining order that became the preliminary injunction, that imposes an injunction upon the court order that requires the Comptroller to process and pay vouchers for the sitting employees at the normal and usual rates of pay. That order does not specify general revenue. That phrase is not in that order anywhere. It's pages 239 and 241 of the record. Second, the Governor's and CMS's argument that they are afraid to draw down the specifically appropriated funds, the revolving funds, for fear of depleting those funds, because they can't pay essential services, is misguided for a couple of key points. First, both of those funds have separate lines in the actual appropriation for different services. So, for instance, $21 million is appropriated from one of the funds for personal services. And many, many more dollars are appropriated for other rights, such as operating equipment, gas for the cars. Those are separate lines within the appropriation. Additionally, the Governor's argument, or the CMS's argument, that they don't want to put the specifically appropriated funds at risk so they can just draw on the general revenue fund evinces a fundamental misunderstanding of what's going on with the general revenue fund right now. The general revenue fund is not an unlimited source of money upon which all state bills can be paid. The general revenue fund right now has an over $14 billion bill backlog. As a result of this, the Comptroller has to be able to exercise her discretion to balance the state's fiscal accounts, to determine what gets paid and when, in order to keep the state going in some measure in this current situation. What do you say to the argument that she has no authority for that discretion? I think that argument is both legally and factually completely wrong. And tell me why. Absolutely. First, the Illinois Constitution provides that the Comptroller is the Chief Fiscal Officer of the state. The Comptroller Act also repeats that, as well as states that she's the Chief Payroll Officer of the state. That's Section 12 of the Payroll Act. Both the Constitution and the statute states that the Comptroller is responsible shall maintain, shall maintain, that is the word used, the Constitution and the statute, maintain the state's fiscal accounts and the state's payroll. Maintain is a verb, it's an action verb that means something. That means, that imposes upon the Comptroller the obligation and the duty to preserve, to keep funds in operation, to keep funds unimpaired. She has discretion borne over that. So they're trying to kind of fine-tune that and say that she just gets to determine if there's legal authority to make payment, but not where that payment comes from. Yes, they are. You're absolutely right, they are arguing that. That's inconsistent with the separation of powers in the language of the Constitution, the requirement that she maintain the funds. That's both in the Constitution and in the Illinois statutory law. Additionally, but not only does the Constitution and statutory law impose this obligation to the Comptroller, but right now in this world that we exist as I stand here, the Comptroller is under a court order requiring her to pay, in this case, in the St. Clair County case, employees at the normal rates of pay, without a fund specified, but she's under a court order to do that. She's also under other court orders to pay other bills in other circumstances. The Comptroller in this situation, as a practical matter, has to have discretion to determine how to balance all these competing obligations that are borne of court orders, especially in this circumstance where there is no full budget that otherwise says this much money can go here, this much money can go here. All these obligations, who constitutionally, the way the Illinois constitutional government is created, which officer is responsible for making these determinations is the Comptroller. It has to entail, that job has to entail the exercise of some discretion by nature not only of the constitutional setup, but also in the actual world we're living in where most of the Illinois government is operating because of court order instead of a budget. The only way to maneuver in this near impossible situation is via the exercise of discretion. But I want to take a step back, if I may, to the point, the basic point is that the standard review here on Judge Lachine's order, the St. Clair County Court's order, is an abuse of discretion. Judge Lachine was asked to construe the meaning of the preliminary injunction and determine whether that included the right to force the Comptroller to process vouchers under unappropriated general revenue fund money. Especially where there was specific appropriations made available by the General Assembly for the payment of state employees. Judge Lachine declined to say, to construe his temporary injunction to include that. Right. Judge Lachine made no findings that I can see about the statutory constitutional arguments that you made. So our review on the issue of the Constitution would be to know them. Well, Your Honor, Judge Lachine discussed in his order. Yeah, but he said he's not going to get into the interagency squabbles or whatever, however he would. That's absolutely true. Judge Lachine also said that the Comptroller's statutory and constitutional duty to maintain the funds necessarily implicates certain actions by her and an element of discretion by her. Well, I'm not sure that that finding exists, but perhaps you could read it that way. It seems that your argument today, or now, is that the Comptroller can pay from unappropriated funds, which is the antithesis of what you just argued in the other appeal. So my question to you is, if you win that appeal, is this the way? And my argument today is, as the Comptroller, a few minutes ago, it was the people who said, these are separate clients making separate arguments, but not necessarily, you know. How can they have it related? I'm not saying they're not related. I'm saying that these are separate clients, which is like possibly different positions on certain things. Got a different handle. In terms of how can the Comptroller use unappropriated money to pay if the injunction goes away? She can't. There would be no expenditure authority. The Comptroller's position is that, and the Comptroller Act, in Section 9 of the Comptroller's, requires that the Comptroller must verify that there is some type of appropriation or other expenditure authority that allows her to process a voucher to draw, you know, a warrant on state finances. Here, you know, in part, that other expenditure authority is the same clerical injunction. The Comptroller is acting as expenditure authority that allows her to draw otherwise unappropriated funds out of the GRF. The Comptroller is taking the place of the General Assembly's responsibility in that circumstance. But in this case, while there is expenditure, and again, with unlimited, the order does not limit or cap how much or specify a certain sum of how much must come out of the General Revenue Fund or any fund for the payment of payment to state employees. Here, the General Assembly has spoken, at least to an extent. The General Assembly has enacted specific appropriations legislation in these revolving funds explicitly for personal services, among many other things. So the General Assembly exercised its exclusive power that is guaranteed by the Appropriations Clause in Article 8, Section 2B of the Illinois Constitution, and it enacted specific appropriations legislation for the payment of personal services via these two funds. Doesn't the temporary budget say something about it won't supersede any court order? Well, that's Section 996 that we were debating about earlier this morning. Yes, Section 996 says that the appropriation authority here does not supersede other court orders or things required by court orders. That's true. It does say that. Nonetheless, it doesn't mean that when faced with specific appropriations tasked by the General Assembly for the payment of employee services, the Comptroller must use unappropriated General Revenue Fund. So if the order had said that they had to use GRF, then they would have had to use GRF. Yes. But then she specifically declined to go there when he denied the comments in this appeals motion. He specifically said, that's not what I intended this would be. I'm not going to get into that fight. And that makes sense, because it is well established that a preliminary injunction can only be as broad as necessary to remedy the harm. The harm that Jack Lucey was remedying in this case was government inaction. He uses that word multiple times in the Tiago Award to remedy that inaction in the form of the failure to appropriate sufficient funds for the payment of state employees. So where there is inaction, where there is a failure to appropriate specific funds, the injunction is operative. But if there is actual appropriation, specific inactive appropriations by the General Assembly for the payment of state employees, the injunction is not operative or is not needed. Again, I'd like to highlight the fact that in this case, the two revolving funds at issue that contain the specific employee personal services appropriations, and they're both in Article 79 of the StopGap Legislature, Section 45 for the Facilities Management Revolving Fund, and Section 55 for the State Garage Revolving Fund. They have specific lines for personal services, and they have other lines for other essential, so-called essential services. The payment of one does not mean that others don't get paid. And there is an issue that they don't get paid. And, indeed, they have been paid because the Comptroller required vouchers to be submitted. They have been. Over objection of CMS. Yeah. And CMS has submitted vouchers, and they have since the Judiciary Board now underpinned this appeal. They have been paid out of this fund. So, really, we have to determine whether we're going to read the constitutional provisions very narrowly, as suggested by your opponent, or somewhat more broadly to allow the Comptroller discretion. That's the essence of if you boil it all down. Yes. I would boil it down to that, yes. I like to boil things down. And I appreciate that, though, as a lawyer, I often struggle against one of them. It's not very much. Well, I like to get to the heart of it. No, and I certainly appreciate that. I would say that the language of the original St. Clair order that imposes certain obligations on the Comptroller changes things a little bit, because they add extra duties to the Comptroller that, you know, I think complement or are consistent with the constitutional requirements. But even if you take it narrowly, you still have the burdens or the requirements imposed upon her by all these different court orders. I think you can reconcile that. Well, what are those additional requirements in the order? Well, the additional requirement in the order is that she's under a court order to make sure that state employees get paid. Yeah. That requires, for instance, finding the money from someone. So even if the order doesn't direct her to use any funds, so she necessarily has to exercise discretion in creating revenue lines for agencies to use to draw funds down. Like she at the very minimum has to exercise her discretion in determining what funds we can use out of this unappropriated pile of money. So that inherently requires an exercise of her discretion. In addition, though, to the requirements, the constitutional statutory requirements, that she maintain these funds and supervise the state payroll as specified by Section 12 of the Comptroller Act. Ultimately, Your Honors, in our review of this, the Comptroller is not discerning any power of the Governor. It is not too important to discern any power of the Governor. The Comptroller is intending only to exercise her statutory and constitutional obligations as well as the obligations imposed by the court order. Right now, there are more demands on the public treasury than there is money. Many more demands. The Comptroller is the state officer that has been constitutionally given the obligation to maintain the state's fiscal accounts, to exercise the discretion to make sure, as best as possible, these get paid and money stays in the state accounts for necessary purposes. That is the Comptroller's role in this very difficult situation, and it is certainly not an effort to discern any power of any other state officer but only to do what she required constitutionally, statutorily, and by court order to do. For these reasons, we ask that you affirm the Circuit Court's order on this agenda. Thank you very much. Thank you, Counsel. Counsel? Very briefly, I want to start with Justice Kate's question about standard of review. I think that, Your Honor, you hit it right on the nail. There are no actual findings to be made here. This is a pure legal question. That pure legal question is, under the state constitution, who gets to decide which of two equally valid funding sources the voucher is submitted on requesting payment? What the Comptroller's argument boils down to is they're taking the word maintain in isolation, and they're giving it the definition that they want to give it. There's a problem with that. State statute already explains what it means and how the Comptroller goes about maintaining the state fits. That is the process that I described earlier where the state agency submits a voucher. The Comptroller, if you look at Section 9C of the Comptroller Act, the only thing that the Comptroller does there is verify the accuracy of that voucher. So when you are looking at that legal question and you are looking at that separation of powers problem, that is where you go to look for the definition of what it means to maintain the state's FISC as a Comptroller. What that does not mean is that the Comptroller gets to look at two sources which my colleague conceded that the Comptroller, not the Attorney General, because you have to make that distinction between the two strange hats that the Attorney General is trying to wear here. The Comptroller concedes that both sources of funding at issue in this appeal are valid. So the question is not, as the Comptroller is trying to pitch it, who gets discretion to balance where you find the cash to make a payment. That is distinct from where is that cash supposed to be paid from. We understand and we don't dispute that the state of Illinois has more bills than it has cash to pay them. That is just a matter of public record that this court can take additional notice of. The difference is who gets to say which of two funds is drawn upon and then if, as a factual matter, there is not enough cash to make all of those payments, then you are going to have something like the bill backlog that my colleague referenced. That is a very different question than the legal question. That is a question of how long does it take for those bills to get paid. But if the Comptroller is under a court order to get people paid and the fund, the general revolving fund, does not have enough money to make those payments that she is under a court order to pay, what do you expect her to do? Just say, we will give you an IOU? No, actually expect the Comptroller to do what she has been doing and the reason that there is a $14 million backlog is she recognizes that the voucher is proper. For that backlog, she recognizes that the voucher is proper. But it takes a while for the cash to come in as people are having cash withheld from their paychecks, things like that. So you do expect people to show up for work and not get paid? No. Because she has no discretion? No. So she will draw down that money first? That is right. And then go to the general revenue fund when it is all gone? No, slightly differently, Your Honor. What happens is the Comptroller has a fund, a general revenue fund. There are vouchers submitted into that fund by state agencies. The Comptroller then has a certain amount of cash to pay those vouchers. What she does is she will issue warrants to the state treasurer to make those payments and that is where the discretion that you are worried about, Justice Cates, comes in. She gets to decide when she sends those warrants over and that is what she has been doing. So she will send over a warrant saying pay employees pursuant to the court order. What she does instead is that she waits to send a warrant to the treasurer to pay other bills that would draw on that same source of funding. So the point at which discretion occurs is the juggling of when you actually make the payments not where the vouchers are submitted to have those payments made because there are two parts of the process. But that is my question. If the fund that you are talking about becomes insufficient for all services Correct. But there are other funds available. What your argument says is a strict construction of the Constitution would prevent her from allowing employees to be paid from the other funds. I don't think that we are in that situation. I am not talking about whether we are in it now. I mean, if it happens, hypothetically, that is what would occur. A strict construction view would say she cannot pay from any other fund. If there is no money, there is no money. The reason that I am quibbling with that is not because I disagree with your legal premise there. The reality is that in the general revenue fund, there are always new dollars coming in and what the comptroller does so that the premise that there will never be dollars in the general revenue fund is a factually inaccurate premise. So you are saying there will never be an occasion where there is inadequate cash to pay employees pursuant to these court orders. So, for example, our health insurance just won't get paid. That is what is happening all over. Or some other service that is not covered by court orders. So the comptroller is just going to kind of put it aside and say, well, we will pay that later when we have the cash. That is factually what the comptroller has been doing for about the last two years. Yes, I am well aware. That is correct. She has been prioritizing not which voucher but which warrants she issues to have them pay. But you are saying that as far as employee services go, it will never occur. My hypothetical would not occur. I don't know that factually I can say that it will never occur. I think it will be highly unlikely. Okay. That is fair. Unlikely to occur. I just can't speak to it. No, no. That is fair. Okay. Thank you, Your Honor. Thank you, counsel. We appreciate the briefs and arguments. Counsel, this case will be taken under advisement. Thank you. Do you want to go ahead with your advice? I can do it.